UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
CHARLES JOHN CASOLARO, individually,
CASOLARO & ASSOCIATES, P.C.,
CHARLES JOHN CASOLARO, as the legal
guardian of Albert Casolaro, GENE
GREGORY VOULO, individually, and      **MEMORANDUM & ORDER**
SOUTHFORK EQUITY GROUP, LLC,      10-CV-4276 (PKC)

                Plaintiffs,

       -against-

SCOTT ARMSTRONG, individually, and
THALIA STREET, LLC,

                Defendants.
--------------------------------------------------------X

PAMELA K. CHEN, United States District Judge:

      This case involves a poorly-drafted settlement agreement executed by Plaintiffs and Defendants to resolve a dispute over a financial transaction previously entered into by the parties. In 2009, Plaintiffs Charles Casolaro and Gene Voulo, on behalf of themselves, their respective companies and Casolaro's father, purchased a tranche of a collateralized mortgage obligation ("CMO") through Defendants Scott Armstrong and his company, Thalia Street LLC. With Casolaro's consent, Armstrong subsequently invested the tranche abroad. The transaction did not proceed as Plaintiffs expected, and in 2010, Armstrong agreed to buy Plaintiffs out of the transaction. The parties executed a Settlement Agreement whereby Plaintiffs would sell their tranche to Defendants and release any potential claims against Defendants, in exchange for Defendants' payment of $420,000 by a specific date.

      When Defendants failed to pay Plaintiffs by the date set forth in an amendment to the Settlement Agreement, Plaintiffs brought this diversity action, alleging breach of contract and

other claims.[1] The dispute before the Court is one of contract interpretation: are Plaintiffs' transfer of the CMO tranche and release of claims against Defendants triggered by the execution of the agreement or by Defendants' payment of the $420,000 (which has not yet occurred)? Each side argues for a reading of the Settlement Agreement that is not entirely consistent with its text. Based on certain provisions in the contract, Plaintiffs contend that transfer and release took place upon execution of the agreement; thus Plaintiffs have fully performed under the agreement, and Defendants, by not paying the $420,000, are in breach of the agreement. Based on *other* provisions of the agreement, Defendants contend that transfer and release only take place upon Defendants' payment of the $420,000. Thus, according to Defendants, Plaintiffs have not satisfied their obligation to perform, *i.e.*, transfer ownership of the CMO tranche to Defendants and release all claims against Defendants, because Defendants have not paid; therefore Plaintiffs cannot recover for breach of contract.

The Honorable Dennis Hurley, who previously presided over this case,[2] denied Plaintiffs' attempts to resolve the case on summary judgment, finding the record insufficient to support Plaintiffs' interpretation of the agreement. *Casolaro v. Armstrong*, No. 10-cv-4276, 2012 WL 976063 (E.D.N.Y. Mar. 22, 2012) ("*Casolaro I*") (denying Plaintiffs' first motion for summary judgment on Plaintiffs' claim for breach of contract); *Casolaro v. Armstrong*, No. 10-cv-4276, 2012 WL 6093778 (E.D.N.Y. Dec. 7, 2012) ("*Casolaro II*") (denying Plaintiffs' renewed motion for summary judgment on same claim). Accordingly, this Court conducted a one-day bench trial on November 17, 2014 to develop the record on the Settlement Agreement's ambiguous

---

[1] Plaintiffs' other claims include breach of the covenant of good faith and fair dealing, unjust enrichment, breach of fiduciary duty and conversion, all under New York law. *See* Dkt. 1, Compl. They only sought summary judgment on their breach of contract claim.

[2] This matter was re-assigned to me on April 22, 2013.

2

language and the parties' intent in executing the agreement. The trial focused solely on the Plaintiffs' breach of contract claim.

The Court now issues its findings of fact and conclusions of law. The Court finds that the Settlement Agreement is not ambiguous on the issue of Plaintiffs' release of claims; the Settlement Agreement and its subsequent amendment clearly state that release shall take place upon Defendants' payment. Thus, because Defendants' payment has not yet occurred, Plaintiffs have not released their claims.

However, the Court agrees with Judge Hurley's prior ruling of ambiguity with respect to the transfer of the CMO tranche. After reviewing extrinsic evidence to determine the parties' intent, the Court determines that the parties' goal in executing the Settlement Agreement was to allow Plaintiffs to exit the transaction through a buy-out by Defendants. To best achieve this intent, the Court resolves the Settlement Agreement's ambiguity in Plaintiffs' favor, finding that they relinquished right, title and interest to their CMO tranche when the parties executed the Settlement Agreement on June 11, 2010. This conclusion is further bolstered by Defendants' post-contract conduct and the parties' prior course of dealing, which show that Armstrong has been acting as the owner of Plaintiffs' CMO tranche following the execution of the Settlement Agreement and its amendment.

Finally, the Court determines that Plaintiffs' recovery is not barred despite the fact that their performance is technically incomplete. The only reason that Plaintiffs have not been able to release their claims is because Defendants have not paid. New York law is clear that a party's failure to perform will not be fatal to its recovery "where a defendant's conduct was an impediment to performance and where Plaintiff was otherwise ready, willing, and able to perform." *Exportaciones Del Futuro S.A. de C.V. v. Iconix Brand Grp. Inc.*, 636 F. Supp. 2d

223, 229-30 (S.D.N.Y. 2009). Therefore, for the reasons set forth below, the Court hereby awards judgment to Plaintiffs on their breach of contract claim.

I. **FINDINGS OF FACT**

  A. **The Parties**

Plaintiff Charles John Casolaro ("Casolaro") is an attorney who created the law firm Casolaro & Associates, P.C., also a plaintiff in this action. (Tr. 19.[3]) In 2009, Casolaro was the legal guardian of his father, Albert Casolaro, and became administrator of the estate of Albert Casolaro in September 2010 after his father's passing. (Tr. 19.)

Plaintiff Gene Gregory Voulo ("Voulo") is Casolaro's brother-in-law. (Tr. 20, 50.) Voulo is a medical doctor and also the managing member of Plaintiff Southfork Equity Group, a real estate company in Long Island. ("Southfork Equity"). (Tr. 50.) Voulo did not testify before the Court.

Defendant Scott Armstrong ("Armstrong") is a medical sales professional who conducted trades and made investments through Defendant Thalia Street LLC ("Thalia Street"). (Tr. 46-47.) Thalia Street LLC is now defunct. (Tr. 8.)

  B. **The CMO Transaction**

In 2009, Armstrong purchased a tranche of a CMO to be traded abroad ("the Armstrong tranche"). (Tr. 130-31.) It came from a CMO numbered 44628FAK7 ("the FAK7 CMO"), and purportedly had a face value of $324 million. (Tr. 130, 137; Pl. Ex. 3, Letter from Brendan Cook to Nicoklas Kangerlaris (Nov. 6, 2009).)

---

[3] All references to the trial transcript will be denoted as "Tr. __."

As Armstrong prepared to invest his tranche, Voulo, whom he knew from an existing business relationship, introduced him to Casolaro. (Tr. 129.) Casolaro and Voulo sought to participate in a similar transaction. (Tr. 21, 130-32.)

After some discussion among the three men, Armstrong facilitated Plaintiffs' purchase of a tranche from the FAK7 CMO ("the Casolaro tranche"). (Tr. 21-2, 130-32; Def. Ex. B Master Fee Protection Agreement (Apr. 8, 2009) ("Master Fee Agreement").) Plaintiffs purchased the other half of the FAK7 CMO for $400,000, with money from Casolaro & Associates, Southfork Equity, Albert Casolaro's guardianship funds, and Casolaro's personal funds. (Tr. 44, 112-13.) The Casolaro tranche purportedly had a face value of $305 million. (Tr. 137.) It was purchased by Thalia Street, which was the entity listed as its record owner. (Tr. 73, 168, 207; Court Ex. 1, Deposition of Michael DeNio at 52 (Jul. 17, 2013) ("DeNio Dep.").)

Before trading the Casolaro tranche abroad, Armstrong secured Casolaro's consent to do so. (Tr. 99-100.) Casolaro consented to the transfer of the Casolaro tranche from Thalia Street's account at Transcend Capital in Dallas to a sub-account held by Atlas Treasury, located at Geniki Bank in Greece. (Tr. 99; Def. Ex. A, Consent by Charles J. Casolaro (May 29, 2009) ("Casolaro Consent").) Armstrong sought Casolaro's consent because he viewed Casolaro as the owner of the tranche and thus needed Casolaro's approval. (Tr. 134 ("After all, this is his instrument. I need his approval"); 174 ("I can't send his CMO somewhere just because I want to send mine.").)

After receiving Casolaro's approval, Armstrong arranged for the Casolaro tranche and the Armstrong tranche to be sent electronically to Atlas Treasury to be monetized. (Tr. 99-100, 135-36.) The parties expected to receive interest payments from the trades. (Tr. 100, 148.)

5

The transaction did not go as the parties expected. Neither Plaintiffs nor Defendants received the payments promised by Atlas. (Tr. 24, 95, 197.[4]) After a few months elapsed without interest payments, Casolaro believed the CMO had been lost. (Tr. 24-25, 55.) Armstrong engaged outside counsel to track down the CMO after determining that Atlas' CEO, Kangelaris, had not been forthright with him. (Tr. 138-39, 197.) Armstrong sought to obtain the funds that Atlas promised to the parties or else have the CMO returned to Thalia Street. (Tr. 197.)

Upset with the course of proceedings and the lack of payments, Casolaro sent a letter to Armstrong on behalf of all Plaintiffs on May 24, 2010. (Tr. 55-56; Pl. Ex 2, Letter of Charles J. Casolaro to Scott Armstrong (May 24, 2010) ("Demand Letter").) The Demand Letter threatened legal action against Armstrong, and set forth potential claims Plaintiffs might pursue against Armstrong for his alleged mismanagement of the CMO transaction. (*Id*.)

### C. Execution of Settlement Documents

#### 1. Settlement Discussions and Execution of the Release and Purchase & Sale Agreement

After receiving the Demand Letter, Armstrong attempted to persuade Plaintiffs to continue to pursue a transaction with the Casolaro tranche (Tr. 179), but Plaintiffs no longer wanted to be part of it, (Tr. 25-26.) Armstrong recognized that Plaintiffs did not want to continue pursuing a transaction, nor did they want their tranche returned. (Tr. 203 ("[Plaintiffs] did not want [their tranche] back. They absolutely did not want it back. . . . They didn't want to be part of this transaction any longer."), 206 (agreeing that Plaintiffs "didn't want to be involved" in the CMO transaction anymore).) Armstrong thus agreed to buy Plaintiffs out of the

---

[4] Armstrong represented that Kangelaris ultimately spent several months in jail for his wrongdoing. (Tr. 139.) Casolaro stated he was not aware of this. (Tr. 96.)

transaction by purchasing their tranche so that he could "continue on the path of a transaction." (Tr. 204.[5])

Because communication between the parties had deteriorated, Armstrong engaged his outside counsel, Shon Ramey, to negotiate a settlement with Plaintiffs. (Tr. 143-44.) Armstrong did not participate in these discussions. (Tr. 180.) Ramey drafted two documents: (1) an eight-page settlement agreement and release, whereby Plaintiffs would release the claims asserted in the Demand Letter ("Release"), and (2) a seven-page purchase and sale agreement whereby Defendants would buy the Casolaro tranche from Plaintiffs for $420,000 ("PSA"). (*See* Pl. Ex. 1, Settlement Agreement.[6]) Defendants were to pay Plaintiffs by June 30, 2010. (*Id.*)

Casolaro accepted the agreement as drafted by Ramey. (Tr. 111.) He did not make any changes nor consult an outside attorney before signing, and avers that he read the entire agreement before affixing his signature to the documents. (Tr. 115-16.) Casolaro and Voulo signed the Release and PSA on June 4, 2010. (Pl. Ex. 1, Release at 7, PSA at 7; Tr. 39, 107.)

Armstrong read the agreement before signing it. (Tr. 181.) He signed the Release and the PSA on June 11, 2010. (Pl. Ex. 1, Release at 8, PSA at 7; Tr. 39, 107, 143.) Because the agreement was fully executed upon Armstrong's signature, the Settlement Agreement's execution date is June 11, 2010.

---

[5] Armstrong also claimed that he settled, in part, out of fear of being sued by Plaintiffs. Armstrong repeatedly referenced Casolaro's "harassment" as a motivating factor to settle the dispute. (*See, e.g.*, Tr. 141, 164.) Any such tactics by Casolaro do not, however, undermine the legitimacy of the Settlement Agreement. *Casolaro I*, 2012 WL 976063 at *3 (rejecting Defendants' bid to have the contract declared void as a product of coercion and duress). The Court considers Armstrong's testimony to provide context for his willingness to settle the dispute, but not as a justification for failing to perform under the agreement.

[6] Because Plaintiffs' Exhibit 1 is comprised of two documents, each with their own pagination, short cites to the Release will refer to the first eight-page document, and short cites to the PSA will refer to the subsequent purchase and sale agreement. When referring to the documents together, the Court will reference them as the Settlement Agreement.

### 2. Execution of the First Amendment to Settlement Agreement

On June 30, 2010, the date that Defendants' payment was due under the Settlement Agreement, Casolaro received a phone call from Ramey. (Tr. 102.) Ramey asked for an additional seven days for Defendants to pay Plaintiffs. (Tr. 102.) Plaintiffs agreed, and Ramey provided Plaintiffs with the First Amendment to the Settlement Agreement and Release. (Pl. Ex. 4, First Amendment to the Settlement Agreement and Release ("First Amendment").) Under the First Amendment, Defendants were required to pay Plaintiffs the $420,000 by July 6, 2010. (*Id*.) Casolaro and Voulo signed the First Amendment on July 1, 2010. (*Id*.) Armstrong signed on July 2, 2010. (*Id*.) Because the amendment was fully executed on Armstrong's signature, the execution date of the amendment is July 2, 2010.

### D. Defendants' Failure to Pay and Plaintiffs' Suit

Defendants did not pay Plaintiffs by July 6, 2010. Plaintiffs filed suit on September 20, 2010 to recover under the Settlement Agreement. Casolaro and Armstrong did not have further contact with one another. (Tr. 167.)

### E. Defendants' Pursuit of An Alternative Transaction

At some point after executing the Settlement Agreement, Armstrong ultimately was able to locate the FAK7 CMO and get it "released and returned" to the Thalia Street account. (Tr. 138-39.) Two years ago, he began working with a colleague, Herb Kurlan, to complete a transaction with the FAK7 CMO in Switzerland. (Tr. 166, 201-02.) The FAK7 CMO still consisted of the Casolaro tranche and the Armstrong tranche. (Tr. 167.) To conduct this new transaction, Armstrong transferred the Casolaro tranche's record ownership from Thalia Street to Kurlan. (Tr. 200-01, 203.) Armstrong testified, without verification, that the Casolaro tranche is currently frozen in the Swiss court system. (Tr. 171, 192.) He also reported, without

verification, that the face value of the tranches remains the same as when the parties purchased them in 2009: $305 million for the Casolaro tranche and $324 million for the Armstrong tranche. (Tr. 198.)

Casolaro was unaware of Armstrong's recent efforts to close a transaction with the Casolaro tranche. (Tr. 96.)

## II. CONCLUSIONS OF LAW

Under New York law, to recover for Defendants' breach of contract, Plaintiffs must prove (1) the existence of a contract between it and Defendants; (2) adequate performance of Plaintiffs' obligations; (3) breach of the contract by Defendants; and (4) damages to Plaintiffs caused by Defendants' breach. *See Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011); *Casolaro II*, 2012 WL 6093778 at *2 n.1 (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)). Judge Hurley's earlier orders narrowed the issues before this Court by establishing the validity of the Settlement Agreement and Defendants' breach through their failure to pay. *Casolaro II*, 2012 WL 6093778 at *2; *Casolaro I*, 2012 WL 976063 at *3-4. Thus, the remaining issue in this case is Plaintiffs' performance under the Settlement Agreement, which is tied to both the second and fourth elements that Plaintiffs must prove.[7] Specifically, the parties dispute whether Plaintiffs' release of claims and transfer of right, title and ownership of

---

[7] Judge Hurley noted that the Settlement Agreement's ambiguity on Plaintiffs' performance also had an impact on Plaintiffs' damages:

> [I]f plaintiffs no longer hold title to the CMO, they would be entitled to the full purchase price under the Agreement, or $420,000. If, on the other hand, plaintiffs retained their interest in the CMO, they would be entitled to the purchase price, plus any incidental loss, minus the current value of the CMO. If plaintiffs indeed retained their interest in the CMO, and its current value is greater than or equal to the purchase price, then plaintiffs could conceivably not have incurred any damages at all.

*Casolaro I,* 2012 WL 976063, at *6.

9

the Casolaro tranche are triggered by the execution of the Settlement Agreement or by Defendants' payment to Plaintiffs.

"In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use." *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (citing *Slatt v. Slatt,* 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645, 477 N.E.2d 1099 (1985)). Under New York law, the Court must first determine whether the language of the written contract is clear or ambiguous. *See Seiden Associates*, 959 F.2d at 429; *see also JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) ("the question of whether a written contract is ambiguous is a question of law for the court."). If the contract's language is "susceptible to differing interpretations, each of which may be said to be as reasonable as another . . . the meaning of the words becomes an issue of fact[.]" *Seiden Associates*, 959 F.2d at 428 (citations omitted).

The Court examines each of Plaintiffs' obligations under the Settlement Agreement.

### A. Plaintiffs' Release of Claims Has Not Yet Occurred

After looking "within the four corners of the document," *Abboud*, 568 F.3d at 396 (citation omitted), the Court determines that the question of when Plaintiffs' release occurs is not ambiguous. Section 1.3 of the Release contemplates Plaintiffs' release of claims upon receipt of Defendants' payment:

> Claimants hereby agree that *upon receipt of the Settlement Payment*, provided such Settlement Payment is made prior to June 30, 2010, that Claimants claims [*sic*] are fully and forever released *upon receipt of the Settlement Payment*.[8]

Similarly, the First Amendment, executed on July 2, 2010, revises Section 1.3 of the Release:

---

[8] Pl. Ex. 1, Release at 2 (emphasis added).

> Claimants hereby agree that *upon receipt of the Settlement Payment*, provided such payment is made prior to July 6, 2010, that Claimants are fully and forever released upon receipt of the Settlement Payment.[9]

Notwithstanding these provisions, Plaintiffs point to Section 3.3 of the Release to contend that they released their claims when they affixed their signatures to the document. (*See, e.g.*, Tr. 33.) Section 3.3 of the Release, however, does not specify when the release of Plaintiffs' claims will take place. It states:

> In consideration for this Agreement, Casolaro . . . hereby fully and forever releases and discharges Armstrong and Thalia [Street] . . . from any and all claims, debts, suits, liabilities, damages . . . including but not limited to, the claims, demands and/or causes of action which were alleged and/or which could have been alleged by or on behalf of Casolaro in the Demand Letter.[10]

The Court rejects Plaintiffs' attempt to find ambiguity regarding their release of claims on the basis of Section 3.3. Notwithstanding Casolaro's mistaken understanding that he released his claims upon signing the agreement, the text of Section 1.3 of the Release is clear: such claims will only be released upon *receipt* of the settlement payment. (*See* Pl. Ex. 1, Release at 2 (emphasis added).) The First Amendment, which Casolaro read and signed several weeks later, is also clear on this point. (*See* Pl. Ex 4.) It was not reasonable for Casolaro to read Section 3.3 of the Release to release his claims against Defendants upon affixing his signature to the Settlement Agreement (*see* Tr. 33), as Section 3.3 does not specify when such release will take place, let alone mention the terms "signature" or "execution."

---

[9] Pl. Ex. 4, First Amendment at 1.

[10] Pl. Ex. 1, Release at 3. Section 3.3 is replicated for each of the Plaintiffs in Sections 3.1 (Voulo), 3.2 (Southfork Equity), 3.4 (Casolaro PC), and 3.5 (Casolaro as guardian for Albert Casolaro).

Thus, the Settlement Agreement and its amendment clearly provide that Plaintiffs' release of claims is only upon Defendants' payment. Because Defendants have not yet paid, Plaintiffs continue to retain the claims they asserted against Defendants in the Demand Letter.

### B. Plaintiffs Transferred The Casolaro Tranche Upon Execution of the Agreement

Judge Hurley properly determined that the contract is ambiguous on the issue of whether Plaintiffs' ownership of the Casolaro tranche transferred to Defendants upon the execution of the Settlement Agreement. *Casolaro II*, 2012 WL 6093778 at *2. The PSA, annexed to the Release, governs the sale of the Casolaro Tranche from Plaintiffs to Defendants for $420,000. PSA at 1. Section 2.1 of the PSA states:

> Upon execution of this Agreement, [Plaintiffs] relinquish and will convey any and all right, title and interest in and to the CMO to [Thalia Street].[11]

However, Section 2.3 of the PSA states:

> As of the Effective Date, [Plaintiffs] will cease to have any right, title or interest whatsoever in the CMO and all right, title and interest as an owner shall be terminated and without any further force and effect.[12]

The PSA elsewhere defines "Effective Date" as "the effective date of this Agreement, which shall be upon receipt by [Defendants] of the Purchase Price."[13] Thus, Section 2.3 provides for the transfer of the Casolaro tranche upon Plaintiffs' receipt of Defendants' payment. These contradictory provisions plainly create an ambiguity. *See, e.g.*, *Nina Penina, Inc. v. Njoku*, 816 N.Y.S.2d 451, 452 (N.Y. App. Div. 2006) (finding conflicting provisions in the contract rendered its terms ambiguous).

---

[11]    Pl. Ex. 1, PSA at 3.

[12]    Pl. Ex. 1, PSA at 3.

[13]    Pl. Ex. 1, PSA at 1.

To resolve the ambiguity, the Court considers extrinsic evidence to determine the parties' intent. *See JA Apparel Corp.*, 568 F.3d at 397 ("[W]here the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered."). Courts have considered testimony offered by the parties, the parties' course of conduct and dealing, and post-contract conduct to determine the parties' intent. *See Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 51 (2d Cir. 2011) (stating factfinder may consider party testimony); *CDR-Wantagh, Inc. v. Shell Oil Co.*, No. 07-CV-4497, 2011 WL 6371582, at *10 (E.D.N.Y. Dec. 20, 2011) ("To determine intent, the court should look to the contract as a whole and the parties' conduct, as well as any evidence of surrounding facts and relevant circumstances, industry custom and practice, and course of dealing.") (citation omitted); *In re Holocaust Victim Assets Litig.*, 256 F. Supp. 2d 150, 154 (E.D.N.Y. 2003) ("'the subsequent conduct of the parties may be used to indicate their intent.'") (quoting *Gordon v. Vincent Youmans, Inc.,* 358 F.2d 261, 264 (2d Cir. 1965)); *Waverly Corp. v. City of New York*, 851 N.Y.S.2d 176, 179 (N.Y. App. Div. 2008) ("The best evidence of the intent of parties to a contract is their conduct *after* the contract is formed.") (emphasis added). Here, the extrinsic evidence offered by the parties includes in-court testimony by Casolaro and Armstrong, documents showing the parties' course of dealing with respect to the underlying CMO transaction, and a deposition of Michael DeNio, the President of Transcend Capital.[14]

Based on the parties' testimony, their course of dealing, and Armstrong's post-contract conduct, the Court concludes that Plaintiffs' release of claims and transfer of ownership occurred upon execution of the Settlement Agreement.

---

[14] Transcend Capital held the Casolaro tranche in Thalia Street's account, and electronically sent it abroad for trading. *See* Section I.B, *supra*.

The Court first finds that the parties' intent in executing the Settlement Agreement was to allow Plaintiffs to exit the CMO transaction. Both Casolaro and Armstrong testified to Plaintiffs' desire to exit the CMO transaction when they failed to receive their interest payments from Atlas. Casolaro testified that Plaintiffs made plain to Armstrong that they wanted their initial investment back. (Tr. 25 ("[O]ur conversations with Armstrong were well, we want our money back"). Armstrong understood this, testifying that Plaintiffs did not want their tranche back and did not "want to be part of this transaction any longer." (Tr. 203.) And while the Settlement Agreement's language is unclear regarding the timing of the transfer, it unequivocally calls for Defendants to buy Plaintiffs out of the transaction.[15]

Yet, under Defendants' reading of the Settlement Agreement and the current circumstances, the parties could never realize the contract's intended purpose. Under Defendants' reading of the agreement, the timing and terms of Plaintiffs' transfer of the Casolaro tranche is controlled entirely by Defendants.[16] If, as Defendants argue, the Casolaro tranche's

---

[15] *See, e.g.* Pl. Ex 1., Release at 1 ("The Settling Parties agree to pay the sum total . . . to Claimants in accordance with provision 1.2, in exchange for which Claimants agree to (i) transfer all right, title and interest in the CMO to the Settling Parties pursuant to the Purchase and Sale Agreement, dated as of June __, 2010 . . . and (ii) agree to fully and forever discharge and release Settling Parties as provided in Section 3.0 hereto.").

[16] The very idea that Defendants control Plaintiffs' ability to dispose of the tranche dilutes Defendants' argument that Plaintiffs have right, title and ownership over it, but the notion that Plaintiffs "owned" the Casolaro tranche is itself somewhat of a legal fiction. Armstrong testified to the fact that Defendant Thalia Street was the record owner of the Casolaro tranche, starting in 2009 and through the time of settlement. (*See* Tr. 168 ("Q: Who is the record owner? A: Thalia Street, it would be in the Thalia Street, yes.").) Casolaro could not send the Casolaro tranche to another account; financial institutions would not recognize him, and therefore Armstrong, as the record owner of Thalia Street, was the only individual who could do so. (*See* Tr. 154, 192, 202.) DeNio, the President of Transcend, confirmed that Casolaro "had no authority relative to Thalia Street" (DeNio Dep. at 33), and that Transcend would not recognize Plaintiffs as owners of the tranche. (*Id*. at 51-52.) Finally, Armstrong admitted that he would not have to present the Settlement Agreement to any financial institution to be able to exercise ownership of the Casolaro tranche. (Tr. 207.)

14

transfer is predicated on payment, Plaintiffs now cannot exit the transaction as the parties originally contemplated, because Defendants have not paid. Indeed, Defendants' breach would render the agreement unenforceable, which Plaintiffs clearly did not intend. (*See* Tr. 117 ("[I]t didn't register with me, your Honor, that had [Armstrong] not paid me, this would have been an open-ended agreement.").) Because an unenforceable contract is directly "contrary to the reasonable expectations of the parties," Defendants' interpretation cannot prevail. *See In re Lipper Holdings LLC*, 766 N.Y.S.2d 561, 562 (App. Div. 2003) ("A contract should not be interpreted to produce a result that is absurd . . . or contrary to the reasonable expectations of the parties.").

Furthermore, despite Armstrong's insistence that Plaintiffs continue to own the Casolaro tranche, the contrast between his post-contract conduct and the parties' course of dealing evinces a belief that he already owns the Casolaro tranche. Armstrong testified that he was willing to buy the Casolaro tranche because he wanted to continue on the path of a transaction. (Tr. 204.) In the past two years, he has done just that, working with a colleague to complete a transaction in Switzerland with the Casolaro tranche. (Tr. 166, 201-02.) Casolaro, however, did not know about this transaction, though it involved "his" tranche. (Tr. 96.) Nor is there any evidence that Armstrong sought Casolaro's consent to conduct the transaction in Switzerland, as Armstrong had done for the attempted transaction with Atlas. (*See* Def. Ex. A.[17]) The Court can only conclude that Armstrong made no attempt to do so.

In addition, while Thalia Street was the previous record owner of the Casolaro tranche, it now has a new record owner: Kurlan. (Tr. 200-01.) Armstrong stated that he gave Kurlan

---

[17] Nor can Defendants rely on the May 2, 2009 consent (Def. Ex. A) as a blanket consent by Casolaro to allow Defendants to move the Casolaro tranche to other accounts, because the consent only governs a move between Thalia Street's account at Transcend to a sub-account at Atlas Treasury.

15

authority to help him with the transaction involving the Casolaro tranche. (Tr. 203 ("*I* gave [Kurlan] the authority to help *me* with this.") (emphasis added).) If Armstrong truly believed that Plaintiffs continued to hold right, title and interest to the Casolaro tranche, he would have secured their consent to transfer it to the Swiss bank system and to Kurlan's record ownership, just as he had done in connection with the failed transaction with Atlas. Armstrong's post-contract conduct directly contradicts the interpretation of the Settlement Agreement he espouses.

Thus, the Court finds that Plaintiffs' right, title and ownership in the Casolaro tranche transferred to Defendants on June 11, 2010, the date the parties executed the Settlement Agreement.

### C. Plaintiffs Have Adequately Performed Under The Agreement And Suffered Damages in the Amount of $420,000

The Court's split determinations on Plaintiffs' obligations under the agreement are not fatal to their recovery. The only reason that Plaintiffs have retained their claims is because Defendants failed to pay them. By seeking to defeat Plaintiffs' breach of contract claim by relying on their own failure to perform, Defendants essentially ask the Court to allow them to enjoy the benefits of the Settlement Agreement without the burden of paying. New York law, however, does not allow such conduct. *See Exportaciones Del Futuro S.A. de C.V. v. Iconix Brand Grp. Inc.*, 636 F. Supp. 2d 223, 229-30 (S.D.N.Y. 2009) ("[F]ailure to perform is not necessarily fatal where a defendant's conduct was an impediment to performance and where Plaintiff was otherwise ready, willing, and able to perform.").[18] The Court will not excuse

---

[18] Indeed, other courts have found a plaintiff's performance to be excused *entirely* by a material breach by a defendant. *See, e.g.*, *Barbagallo v. Marcum LLP*, 925 F. Supp. 2d 275, 287 (E.D.N.Y. 2013) ("Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach.") (quoting *Merrill Lynch & Co, Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007)). Defendants' breach here is clearly

16

Defendants from their obligation to pay, particularly where they have continued their efforts to monetize property that they claim belongs to Plaintiffs.

Therefore, the Court finds that right, title and interest to the Casolaro tranche passed from Plaintiffs to Armstrong on June 11, 2010, the date that the parties executed the Settlement Agreement. Plaintiffs have adequately performed under the Agreement, and have been damaged in the amount of $420,000, plus pre-judgment interest from July 6, 2010.

## CONCLUSION

The Court grants Plaintiffs' claims for breach of contract. The Clerk of the Court is respectfully requested to enter judgment against Defendants in the amount of $420,000 plus pre-judgment interest in the amount of $169,344, calculated from July 7, 2010 to the date of judgment.[19] The parties shall bear their own fees and costs.

SO ORDERED.

*/s/ Pamela K. Chen*
PAMELA K. CHEN
United States District Judge

Dated: December 29, 2014
Brooklyn, New York

---

material, as their failure to pay goes to the "root of the agreement between the parties." *Frank Felix Associates*, *Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997).

[19] Pre-judgment interest in New York is 9%. N.Y.C.P.L.R. § 50004. The Court used the following calculation to calculate pre-judgment interest: $420,000 (settlement amount) x .09 (NY statutory interest rate) x 4.48 (years since July 7, 2010, the day after payment was due).